**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **DONALD RAY VICKS** | **CIVIL ACTION** |
| **VERSUS** | **NO. 13-4773** |
| **ROBERT TANNER, WARDEN, ET AL.** | **SECTION: "R"(1)** |

**REPORT AND RECOMMENDATION**

Plaintiff, Donald Ray Vicks, a state prisoner, filed this civil action pursuant to 42 U.S.C. § 1983. He named as defendants Warden Robert Tanner, Deputy Warden Keith Bickham, and Assistant Warden Johnny Gerald. In this lawsuit, plaintiff claims that the defendants "violated plaintiff's Eight [sic] Amendment rights to be free from cruel and unusual punishment by depriving him of all opportunities to engage in meaningful exercise for 17 months consecutively as a means of punishment."[1]

The defendants filed a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[2] Plaintiff opposed that motion.[3] The defendants thereafter filed a reply memorandum.[4] Because that reply memorandum presented matters outside of the complaint for the Court's consideration, the Court converted the defendants' motion into one for summary judgment and gave plaintiff the opportunity to file a supplemental response.[5] See Fed. R. Civ. P. 12(d). His

---

[1] Rec. Doc. 1, p. 18.

[2] Rec. Doc. 12.

[3] Rec. Doc. 17.

[4] Rec. Doc. 20.

[5] Rec. Doc. 21.

supplemental response was filed on February 18, 2014,[6] and this matter was taken under submission. For the following reasons, the undersigned now recommends that the defendants' motion be **GRANTED**.

I. Standards of Review

In reviewing a motion for summary judgment, the Court may grant the motion when no genuine issue of material fact exists and the mover is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). There is no "genuine issue" when the record taken as a whole could not lead a rational trier of fact to find for the nonmovant. Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

"Procedurally, the party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." Taita Chemical Co., Ltd. v. Westlake Styrene Corp., 246 F.3d 377, 385 (5th Cir. 2001) (quotation marks and brackets omitted). The party opposing summary judgment must then "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (quoting Fed.R.Civ.P. 56); see also Provident Life and Accident Ins. Co. v. Goel, 274 F.3d 984, 991 (5th Cir. 2001). The Court has no duty to search the record for evidence to support a party's opposition to summary judgment; rather, "[t]he party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which

6 Rec. Doc. 22.

the evidence supports his or her claim." Ragas v. Tennessee Gas Pipeline Co., 136 F.3d 455, 458 (5th Cir. 1998). Conclusory statements, speculation, and unsubstantiated assertions are not competent summary judgment evidence and will not suffice to defeat a properly supported motion for summary judgment. Id.; Douglass v. United Servs. Auto Ass'n, 79 F.3d 1415, 1429 (5th Cir. 1996).

## II. Plaintiff's Factual Allegations

In this lawsuit, plaintiff makes the following allegations. He is confined on the Special Management Unit ("SMU") at the Rayburn Correctional Center due to his prison disciplinary record. The SMU cells "are crammed with iron fixtures that restrict [his] range of movement due to being a safety hazard and prevent [him] from getting vigorous enough exercise inside the cell."[7] Although he is allowed opportunities for outdoor exercise, the prison policy challenged herein requires that he be confined in an exercise cage while in full restraints which allow him to move his arms, hands, and feet only a few inches while exercising.[8] Plaintiff, who has the human immunodeficiency virus, has suffered health problems while confined on SMU, including "lower back pain, joints being stiff, sore and hard to move, stomach cramping, heart burn, constipation and sometimes vomiting."[9] He has been advised by the medical staff to exercise more, and he opines that his inability to exercise vigorously unrestrained has worsened his ailments. When he complained and asked that he be

---

[7] Rec. Doc. 1, p. 11.

[8] Id. at p. 12.

[9] Id. at 14.

allowed to exercise without full restraints, the defendants were unmoved, telling him that his recourse was to improve his behavior so that he could be released from SMU.

III. Plaintiff's Legal Claim

Plaintiff claims that the defendants' actions violated the prohibition against cruel and unusual punishment found in the Eighth Amendment to the United States Constitution. Concerning that constitutional provision, the United States Supreme Court has explained:

> The language of the Eighth Amendment, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted," manifests an intention to limit the power of those entrusted with the criminal-law function of government. The Cruel and Unusual Punishments Clause was designed to protect those convicted of crimes, and consequently the Clause applies only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions. An express intent to inflict unnecessary pain is not required, and harsh conditions of confinement may constitute cruel and unusual punishment unless such conditions are part of the penalty that criminal offenders pay for their offenses against society.
>
> Not every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny, however. After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment. To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety. ... It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause ....

Whitley v. Albers, 475 U.S. 312, 318-19 (1986) (internal citations, quotation marks, and ellipsis omitted).

Moreover, it must be remembered that the restraint policy challenged in this lawsuit involves measures imposed on plaintiff and other offenders on extended lockdown due to disciplinary infractions. In his supporting affidavit, defendant Bickham explains:

21. Offender Vicks in housed in Extended Lockdown Level 1.

22. Extended Lockdown Level 1 is the highest level of disciplinary detention.

23. Offenders may only be sentenced to Extended Lockdown Level 1 if they commit serious disciplinary offenses that threaten the safety and security of the staff, the institution, other offenders, or the offender himself.

24. Offender Vicks was transferred from general population to Extended Lockdown Level 1 when he was convicted of Aggravated Fighting.

....

27. Confinement in Extended Lockdown is reviewed every 90 days.

28. If an offender's conduct improves while in Extended Lockdown, he can graduate to less restrictive custody.

29. Since his initial confinement in extended lockdown, Offender Vicks has committed over a dozen disciplinary violations including two additional instances of Aggravated Fighting.[10]

Defendant Bickham further explains in his affidavit the restraint policy was instituted and is maintained based on concerns of security and discipline:

31. RCC Institutional Directive 3.1.13, which is attached to this affidavit, requires that offenders housed in Extended Lockdown Level 1 be restrained in handcuffs and ankle shackles whenever they are out of their assigned cells, for any reason, including during their hour of outdoor exercise.

32. The Directive was implemented in 2007 by Warden Jeffery Travis who is now Chief of Operations for DPSC.

33. Prior to implementation of the directive, some offenders used their exercise time as an opportunity to attack staff or other offenders.

34. Since the directive was implemented, there have been no serious incidents during exercise time.

---

[10] Rec. Doc. 20-1, p. 3.

....

39. Unrestrained outdoor exercise is a privilege that must be sacrificed by offenders with a proven record of serious misconduct.

40. Offenders in Extended Lockdown have few privileges left to lose.

....

43. In addition to considering unrestrained outdoor exercise to be a privilege, the requirement that offenders in Extended Lockdown Level 1 be fully restrained is a serious security precaution.

44. Again, the offenders in Extended Lockdown Level 1 have committed serious disciplinary violations. They are proven dangers to themselves or others.

45. Offenders in Extended Lockdown require more individualized supervision than offenders in lower security housing.

46. Logistically, one officer takes between 4 and 6 offenders out of extended lockdown at a time for their hour of exercise.

47. It is much safer to escort 6 offenders in restraints than 1 violent or recalcitrant offender who is unrestrained.

....

52. Furthermore, the outdoor exercise pens do not contain holes or tray-hatches through which the handcuffs and shackles can be removed.

53. This makes the process of removing the restraints even more dangerous because the offenders will not be confined when their restraints are removed.

54. Furthermore, the outdoor pens are open to the sky and an offender may be able to climb out or into a neighboring pen to instigate a fight.[11]

Accordingly, because the restraint policy is grounded in concerns of security and discipline, it must be considered in light of the deference generally accorded to prison officials concerning such

[11] Rec. Doc. 20-1, pp. 3-5.

matters. See, e.g., Rhodes v. Chapman, 452 U.S. 337, 349 n.14 (1981) ("[A] prison's internal security is peculiarly a matter normally left to the discretion of prison administrators."); Bell v. Wolfish, 441 U.S. 520, 547 (1979) ("[T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."); Hay v. Waldron, 834 F.2d 481, 486 (5th Cir. 1987) ("We recognize, further, the flexibility that must be accorded prison administrators in carrying out their responsibilities to the public and to the inmates under their care and control. When reviewing policies designed to preserve internal order, discipline and security – preeminent penalogical objectives under [United States Supreme Court jurisprudence] – a court should accord broad deference to prison administrators regarding the reasonableness of the scope, the manner, the place and the justification for a particular policy. ... If a policy is reasonably related to legitimate security objectives and there is no substantial evidence to indicate that prison officials have exaggerated their response to security considerations, courts ordinarily should defer to prison administrators' expertise."); Royal v. Clark, 447 F.2d 501, 501-02 (5th Cir. 1971) ("Federal Courts will not interfere in the administration of prisons absent an abuse of the wide discretion allowed prison officials in maintaining order and discipline." (citations omitted)). While that deference "does not insulate from review actions taken in bad faith and for no legitimate purpose," it nonetheless clearly requires that a federal judge not "freely substitute" her own personal judgment "for that of officials who have made a considered choice." Whitley v. Albers, 475 U.S. 312, 322 (1986). Further, a plaintiff may not be granted relief

simply because prison officials could have achieved their legitimate goals in other less restrictive ways more palatable to inmates or even the federal judiciary, because "administrative officials are not obliged to adopt the least restrictive means to meet their legitimate objectives." Block v. Rutherford, 468 U.S. 576, 591 n.11 (1984).

As an initial matter, the undersigned finds that it is clear that the policy in question is not *per se* unconstitutional. It is beyond cavil that prison officials are allowed to impose unfavorable conditions of confinement on inmates in order to maintain discipline and deter future misconduct. Daigre v. Maggio, 719 F.2d 1310, 1312 (5th Cir. 1983) ("We recognize that isolation is punitive, that prisoners so confined have demonstrated their defiance of prison rules, and that deprivations beyond those imposed on the general prison population is the very essence of internal prison discipline."). Further, the particular deprivation at issue in this case is unrestrained exercise, and, as the defendants correctly note, courts have repeatedly held that restrictions on exercise are not inherently unconstitutional. See, e.g., Miller v. Carson, 563 F.2d 741, 751 n.12 (5th Cir. 1977). Moreover, on at least two occasions, this very Court has rejected claims that the policy in question here violated a prisoner's rights under the Eighth Amendment. Kron v. LeBlanc, Civ. Action No. 11-2263, 2012 WL 4563957, at *21-23 (E.D. La. Oct. 1, 2012), adopted, 2013 WL 823550 (E.D. La. Mar. 6, 2013); Tyson v. LeBlanc, Civ. Action No. 10-1174, 2010 WL 5375955, at *16-18 (E.D. La. Nov. 19, 2010), adopted, 2010 WL 5376330 (E.D. La. Dec. 15, 2010), aff'd, 431 Fed. App'x 371 (5th Cir. 2011).

However, the issue posed by the instant case is whether the failure of the defendants, who are members of the prison's administrative staff *not* the medical staff, to grant *this specific plaintiff*

an exemption to that policy violated his rights *in light of his particular medical condition*. That issue requires further analysis because, "[a]lthough deprivation of exercise per se does not violate the cruel and unusual punishment clause, prisoners are not wholly unprotected; such a deprivation may constitute an *impairment of health* forbidden under the eighth amendment." Miller v. Carson, 563 F.2d 741, 751 n.12 (5th Cir. 1977) (emphasis added).

Nevertheless, as the defendants correctly note in their motion, plaintiff can establish a constitutional violation in this case only if he is able to meet two requirements: "First, he must show that his confinement resulted in a deprivation that was 'objectively, sufficiently serious.' ... The Supreme Court has defined a 'sufficiently serious' deprivation under the Eighth Amendment as the denial of 'the minimal civilized measure of life's necessities.'" Hernandez v. Velasquez, 522 F.3d 556, 560 (5th Cir. 2008) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)). Second, "he also must show that prison officials acted with 'deliberate indifference' to his health or safety." Id.

For the following reasons, it is clear that, *even if* plaintiff could establish an objectively, sufficiently serious deprivation, he clearly cannot establish that the defendants acted with deliberate indifference.[12]

[12] Whether plaintiff could in fact establish an objectively, sufficiently serious deprivation is questionable at best. See, e.g., Ham v. Ozmint, Civ. Action No. 6:10-1095, 2011 WL 1559225 (D.S.C. Apr. 6, 2011) (finding that a six-month deprivation of out-of-cell exercise, even if it resulted in leg cramps, headaches, and stress, was not sufficiently serious), adopted, 2011 WL 1543221 (D.S.C. Apr. 25, 2011), aff'd, 448 Fed. App'x 326 (4th Cir. 2011). But see Turley v. Rednour, 729 F.3d 645, 652 (7th Cir. 2013) (prisoner's allegations that lack of exercise resulting in irritable bowel syndrome, severe stress, headaches and tinnitus were found to be sufficiently serious). However, because plaintiff clearly cannot establish deliberate indifference, the Court can pretermit a finding on that first prong of the analysis.

"Deliberate indifference is an extremely high standard to meet." Domino v. Texas Department of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001). "Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind." McCormick v. Stalder, 105 F.3d 1059, 1061 (5th Cir. 1997); see also Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999). As the United States Fifth Circuit Court of Appeals has explained:

> A prison official acts with deliberate indifference only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. This knowledge requirement is subjective: The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Hernandez, 522 F.3d at 560-61 (internal quotation marks and citations omitted). Therefore, in this case, plaintiff must be able to show that the defendants subjectively knew that denying him an exemption to the facially valid restraint policy posed a "*substantial* risk of *serious* harm" to his health.

No such showing has been made here; on the contrary, the defendants have presented evidence showing that the prison's medical staff had expressly ordered a "duty status" for plaintiff that specifically prohibited him from engaging in outdoor sports other than walking. As defendant Bickham explained in his supporting affidavit:

> 6. Each offender has a duty status.
>
> 7. In general, the purpose of a duty status is to record an offender's physical abilities and limitations so he can be assigned a job that he is capable of doing and that will not cause him injury.
>
> 8. Furthermore, the duty status prevents the offenders from doing certain recreational activities (like sports) that could cause them injury.

....

10. An offender's duty status is determined by medical and/or mental health personnel.

11. The duty status records are maintained separately from the offenders' medical and mental health records so security staff and officers can easily access the information.

12. It is a violation of the disciplinary rules for adult offenders for an offender to violate his own duty status.

13. It is correspondingly a violation of the rules governing staff and security to violate an offender's duty status unless there is a legitimate penological reason to do so. For example, an offender whose duty status prevents him from being outside in the heat can clearly be brought outside in the event of a fire in the unit.

14. I have personally reviewed the duty status of offender Donald Vicks (DOC No. 397218). True and correct copies of Vicks's three most recent duty statuses are attached.

15. Offender Donald Vicks has a "heat precaution" on his duty status.

16. He has had the duty status with heat precautions since 2011.

17. In accordance with DOC Regulation B-06-001 (HC 45), which is attached to this affidavit, heat precautions are implemented on offenders who take certain types of medication that can make them susceptible to heat related illnesses and/or photosensitivity (abnormally heightened sensitivity to sunlight).

18. Specifically, the policy states in pertinent part:

> The prescribing of an antipsychotic medication is an indication for a heat related indoor duty status that specifies the offender must be brought indoors when the outside ambient temperature reaches or exceeds 90 degrees Fahrenheit. A provision for no sports will also be included. In addition, these offenders should not be assigned jobs in environments that are typically hotter than normal indoor temperatures.

19. The heat precautions on Offender Vicks's duty status prevent him from engaging in contact sports, outdoor sports (except walking), and weight lifting.

20. Offender Vicks is fully capable of walking, the only exercise he is allowed to do under his duty status, in his cell or outside while in restraints (unless it is too hot).[13]

Moreover, as Bickham observed:

56. It bears mentioning again that although, Offender Vicks is in Extended Lockdown Level 1 and, as a result of that disciplinary detention, he is required to be restrained while outside his cell, it is his duty status with the heat precautions that is preventing Vicks from engaging in any exercise more strenuous than walking.

57. In other words, if Vicks was not in Extended Lockdown and, thus, not subject to the directive, he would still be prohibited from engaging in any exercise more strenuous than walking.

58. The "heat precaution" on his duty status is specifically designed to protect his health and wellbeing.[14]

In light of the foregoing, the undersigned finds that the record establishes that the defendants did not act with deliberate indifference when they denied him an exemption from the restraint policy based on medical reasons. In his oppositions to the defendants' motion, plaintiff has neither offered any evidence of deliberate indifference, an element of his claim on which he bears the burden of proof, nor in any way rebutted the defendants' evidence. Therefore, summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (summary judgment will be granted against "a party who fails to make a showing sufficient to establish the existence of an element

[13] Rec. Doc. 20-1, pp. 1-3.

[14] Id. at p. 5.

essential to the party's case, and on which that party will bear the burden of proof at trial"); Little v. Liquid Air Corp., 37 F.3d 1069, 1075-76 (5th Cir. 1994) ("[S]ummary judgment is appropriate in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." (emphasis deleted; internal quotation marks omitted)).[15]

## RECOMMENDATION

It is therefore **RECOMMENDED** that the defendants' motion, Rec. Doc. 12, be **GRANTED** and that plaintiff's claims be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from

[15] The undersigned takes care to note that the recommendation herein is limited to the facts of this particular case. Under slightly different facts, a different result might well be required. For example, if the prison's medical personnel had ordered that plaintiff be allowed to exercise unrestrained and the prison's administrative or security personnel intentionally disregarded that order, that would be an entirely different matter. Here, however, there is no evidence that the defendants interfered in any way with plaintiff's formally prescribed medical care. On the contrary, the denial of an exemption was consistent with the medical staff's orders. Moreover, when plaintiff submitted a grievance concerning the restraint policy, defendant Tanner expressly informed him: "If you have any medical complaints related to the use of restraints, you should attend sick call and make your complaint known to the Medical staff." Rec. Doc. 1-1, p. 20.

a failure to object. 28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[16]

New Orleans, Louisiana, this twenty-fourth day of February, 2014.

**SALLY SHUSHAN**
**UNITED STATES MAGISTRATE JUDGE**

[16] Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.